UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WINSTON JERALD CRADDOCK** | **CIVIL ACTION** |
| **versus** | **NO. 11-655** |
| **N. BURL CAIN, WARDEN** | **SECTION: "J" (3)** |

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Winston Jerald Craddock, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On August 23, 2001, he was convicted of second degree

murder under Louisiana law.[1]  On August 29, 2001, he was sentenced to a term of life imprisonment without benefit of parole, probation, or suspension of sentence.[2]  On September 27, 2002, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[3]  The Louisiana Supreme Court then denied his related writ application on March 28, 2003.[4]

On or about March 23, 2004, petitioner filed a *pro se* application for post-conviction relief with the state district court.[5]  On October 12, 2009, he filed a supplemental application with the assistance of counsel.[6]  The state district court denied post-conviction relief on January 7, 2010.[7]  His related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal on June 17, 2010,[8] and by the Louisiana Supreme Court on March 4, 2011.[9]

---

[1] State Rec., Vol. V of VII, transcript of August 23, 2001, p. 71; State Rec., Vol. I of VII, minute entry dated August 23, 2001; State Rec., Vol. III of VII, jury verdict form.

[2] State Rec., Vol. V of VII, transcript of August 29, 2001; State Rec., Vol. I of VII, minute entry dated August 29, 2001.

[3] State v. Craddock, No. 2001 KA 3015 (La. App. 1st Cir. Sept. 27, 2002); State Rec., Vol. VI of VII.

[4] State v. Craddock, 840 So.2d 568 (La. 2003) (No. 2002-K-2679); Supplemental State Rec., Vol. I of II.

[5] State Rec., Vol. VI of VII.

[6] State Rec., Vol. VI of VII.

[7] State Rec., Vol. VI of VII, Reasons for Judgment dated January 7, 2010.

[8] State v. Craddock, No. 2010 KW 0425 (La. App. 1st Cir. June 17, 2010); State Rec., Vol. VI of VII.

[9] State v. Craddock, 58 So.3d 470 (La. 2011) (No. 2010-KP-1672); State Rec., Vol. VI of VII.

On or about March 22, 2011, petitioner filed the instant federal *habeas corpus* application,[10] which the state conceded was timely filed.[11]  However, after he filed this federal application, he also filed another post-conviction application with the state district court.[12]  Due to the ongoing post-conviction proceedings in the state courts, these federal proceedings were stayed.[13] After petitioner was again denied relief by the state district court,[14] the Louisiana First Circuit Court of Appeal,[15] and the Louisiana Supreme Court,[16] these federal proceedings were reopened.[17]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials'

---

[10] Rec. Doc. 3.

[11] Rec. Docs. 13 and 14.

[12] Second Supplemental State Record, Vol. I of I.

[13] Rec. Docs. 22 and 24.

[14] Second Supplemental State Rec., Vol. I of I.

[15] State v. Craddock, No. 2011 KW 1514 (La. App. 1st Cir. Nov. 9, 2011); Rec. Doc. 25-1, p. 63.

[16] State *ex rel.* Craddock v. State, 93 So.3d 592 (La. 2012); Rec. Doc. 25-1, p. 96.

[17] Rec. Doc. 26.

and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v.</u>
<u>Cone</u>, 535 U.S. 685, 693 (2002).

   As to pure questions of fact, factual findings are presumed to be correct and a federal
court will give deference to the state court's decision unless it "was based on an unreasonable
determination of the facts in light of the evidence presented in the State court proceeding."  28
U.S.C. § 2254(d)(2); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application
for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be presumed to be correct.  The applicant
shall have the burden of rebutting the presumption of correctness by clear and convincing
evidence.").

   As to pure questions of law and mixed questions of law and fact, a federal court must
defer to the state court's decision on the merits of such a claim unless that decision "was contrary
to, or involved an unreasonable application of, clearly established Federal law, as determined by the
Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary
to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  <u>Bell</u>, 535
U.S. at 694.

   Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals
has explained:

> A state court decision is contrary to clearly established precedent if
> the state court applies a rule that contradicts the governing law set
> forth in the [United States] Supreme Court's cases.  A state-court
> decision will also be contrary to clearly established precedent if the
> state court confronts a set of facts that are materially
> indistinguishable from a decision of the [United States] Supreme

> Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  <u>White v. Woodall</u>, 134 S. Ct. 1697, 1706 (2014).  However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.  Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

<u>Id</u>. (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  <u>Bell</u>, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief.  <u>Puckett v. Epps</u>, 641 F.3d 657, 663 (5th Cir. 2011)

("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of

the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

      While the AEDPA standards of review are strict and narrow, they are purposely so.

As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary
> conclusion was unreasonable.
>
>     If this standard is difficult to meet, that is because it was
> meant to be.  As amended by AEDPA, § 2254(d) stops short of
> imposing a complete bar on federal court relitigation of claims
> already rejected in state proceedings.  It preserves authority to issue
> the writ in cases where there is *no possibility* fairminded jurists could
> disagree that the state court's decision conflicts with this Court's
> precedents.  It goes no farther.  Section 2254(d) reflects the view that
> habeas corpus is a guard against *extreme malfunctions* in the state
> criminal justice systems, *not a substitute for ordinary error*
> *correction through appeal.  As a condition for obtaining habeas*
> *corpus from a federal court, a state prisoner must show that the state*
> *court's ruling on the claim being presented in federal court was so*
> *lacking in justification that there was an error well understood and*
> *comprehended in existing law beyond any possibility for fairminded*
> *disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from

using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state

courts.").

      The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law

and apply the strictly deferential standards of review mandated therein.  White v. Woodall, 134 S.

Ct. 1697, 1701 (2014).

## II.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts

of the instant case as follows:

> Just before midnight on September 15, 2000, the defendant
> shot and killed Harold Cresson in the parking lot of George's Lounge
> in Pearl River.  The defendant had met and had sexual relations with
> Harold Cresson's wife, Amy Cresson, on several occasions, including
> earlier that night.
>
> Amy had filed a petition for divorce several weeks prior to the
> murder.  Amy believed that defendant intended to leave his wife for
> her, and she believed that her own husband was upset about the
> situation.  Although the spouses were still living together at the time
> of the murder, Harold had plans to move to a house across the street
> in order to continue to care for the two children born of the marriage.
> Harold was aware that the second child born of the marriage was
> possibly the defendant's biological son, but he told Amy that he
> intended to continue to treat the child as his own.
>
> On the night of the murder, defendant and Amy met in
> George's Lounge, together with Connie Morris Holifield and
> defendant's brother, Darren Keith Craddock (Keith).  Defendant and
> Amy left the lounge in defendant's truck, had sexual relations, and
> returned approximately thirty minutes later.  As they arrived at the
> lounge, Harold also arrived and drove his truck directly behind
> defendant's truck.  Defendant exited his truck and returned to the
> lounge, and Amy stayed in the parking lot to speak with her husband.
> She testified that Harold was upset and angry but did not make any
> threats against her or defendant.
>
> Amy rejoined defendant, Connie and Keith in the lounge and
> told them that Harold had not left the parking lot and was sitting in
> his truck.  Defendant then told Amy that she should go home, but she
> replied that she was not ready to go home.  Amy testified that at this
> point, defendant gave his keys to Connie and asked her to go outside
> to see if Harold had done any damage to his truck.  Amy and Connie
> then walked outside to defendant's truck.
>
> Thereafter, defendant and Keith exited the lounge together.
> The two men then split up, with the defendant walking towards his
> own truck and Keith walking towards Harold's truck, which was
> parked directly behind defendant's truck.  Connie could see Keith
> talking to Harold through the closed door of Harold's truck.  As

Harold began to exit his truck, Keith hit him over the head with a beer bottle.  He also hit him on the back with a PVC pipe.  At the same time, defendant reached into his truck and grabbed his .22 caliber pistol.  Amy asked him what he intended to do, and he replied, "I'm going to get the son of a bitch."  He then stated, "oh, yeah, motherfucker, pow," firing a shot at Harold, hitting him in the chest.  Harold died within minutes thereafter.

Police officers who happened to be in the area arrived on the scene within minutes of the shooting.  They saw Harold as he was dying on the ground next to his truck.  They found a PVC pipe in the bed of defendant's truck.  The pipe was covered with what appeared to be blood.  Keith's hand was bleeding heavily, because he had cut it on the broken glass of the beer bottle when he hit Harold.  There was no blood on the victim's hands or any other indication that the victim had injured Keith or defendant.

Initially, Keith told the officers that Harold had shot himself. Later that evening, he told police officers, in an audiotaped statement, that Harold had half a pool stick in his hand at the time he exited his truck and that, because he thought Harold was going to hit him with it, he hit Harold with a beer bottle, cutting his own hand.  He did not allege at that time that Harold had hit him.  At trial, he changed his story and testified that Harold did in fact hit him across the face with the PVC pipe after he hit Harold with a beer bottle.

Initially, at the scene of the murder, when an officer asked defendant where the gun was, he said, "I did it, take me to jail," and he showed the officer his gun, which he had placed under a step approximately one hundred yards away from the victim's body.  Later that evening, in an audiotaped statement to the police, the defendant stated that he and Harold had been fighting when Harold grabbed a pool stick and came running at him with it; he then grabbed his pistol and spun around when the pistol fired accidentally.  He changed his story in his trial testimony.  At trial, he testified that he saw Harold standing over his brother, holding a PVC pipe, and that his brother was screaming and had lost his eyeglasses.  He stated that Harold then came towards him and he grabbed his pistol in self-defense, never intending to fire it and wishing only to deter Harold's aggression.  He further testified that he dropped the gun, then picked it up, at which time it went off accidentally.

According to the autopsy report, in addition to the gunshot wound, there was a linear abrasion and bruise just below the right shoulder blade of the victim; also his lip was torn and swollen, and his left cheek was bruised and scratched.  A forensic pathology expert

testified at trial that the linear abrasion and bruise on the victim's back were consistent with a blunt force trauma caused by some sort of a rod.  There was no alcohol found in the victim's blood sample.[18]

### III.  Petitioner's Claims

#### A.  Petitioner's Conviction was Obtained Through the Use of Perjured Testimony

In his first claim, petitioner argues that his rights were violated because his conviction was obtained through the use of perjured testimony of Constance Morris Holifield.  He also argues that the state's failure to reveal that the testimony was false constitutes a violation of his rights under Brady v. Maryland, 373 U.S. 83 (1963), and the Confrontation Clause.

In the first round of post-conviction proceedings, the state district court denied relief, holding:

> Defendant asserts that two constitutional violations occurred, there was previously undisclosed Brady material, and there was a confrontation violation under the Sixth Amendment.  As to the issue of undisclosed Brady material, the defendant has presented an affidavit from Jack Pierce, who states that Connie Holifield recanted her trial testimony and therefore her testimony at trial was perjured.  In Mr. Pierce's affidavit, not Connie Holifield's affidavit, he asserts that Connie Holifield told him she was not outside the bar when the defendant shot the victim and did not know what happened, but was forced to testify as she did because of threats made against her by police officers, Chet Bowman and Benny Rayner.  Mr. Pierce alleges this is newly discovered evidence.  First, the affidavit by Mr. Pierce is hearsay, as it is his recollection of a conversation he had with Ms. Holifield.  Further, Pierce stated he has a taped statement from Connie Holifield, but there is no tape or transcript of that statement presented with this application.
> The defendant testified at trial that Cresson ran towards him with a pool stick; however, investigating officers found no pool stick

---

[18] State v. Craddock, No. 2001 KA 3015, at pp. 3-6 (La. App. 1st Cir. Sept. 27, 2002); State Rec., Vol. VI of VII.

at the scene of the crime.  Defendant did not appear to be injured, nor did he mention to anyone on the night of the shooting that he had sustained any injury.  However, the victim's body, in addition to the gunshot wound, had various scratches and bruises, a cut and swollen lip, and a linear abrasion and bruise on the back consistent with an injury by some sort of rod, such as a PVC pipe which officers found in the bed of defendant's truck.

Amy Cresson testified as follows:  the defendant and Keith walked out of the lounge together and appeared to be speaking to each other.  They then split up, with Keith walking directly toward Cresson, who was still in his truck, and the defendant walking toward his own truck.  Connie Holifield unlocked defendant's truck so he was able to quickly reach in and grab his pistol.  Prior to the shooting, Amy heard the defendant say, "I'm going to get the son of a bitch.".

Keith Craddock testified at trial that after he hit Cresson with a beer bottle, Cresson hit him in the face with PVC pipe, which he thought was part of a pool stick.  However, on the night of the murder, he did not tell officers that Cresson had hit him.  His statement was that Cresson was carrying half a pool stick when he exited his truck and that he thought Cresson was going to hit him.  When officers asked Keith how he reacted, he stated, "Well, I didn't give him time to do nothing with it actually ... I hit him.  First."  Further, Keith admitted at trial that he asked his brother at the police station that night, "Why did you shoot him, Jerald?  I had him whipped."

The defendant also failed to offer any evidence at trial to support his claim that his gun discharged accidently, and the testimony of Sergeant Otto Stubbs, Jr. of the St. Tammany Parish Sheriff's Office, an expert in the field of ballistics, supported the State's assertion that it was highly unlikely that the defendant's firearm discharged accidently.  Sergeant Stubbs testified that defendant's .22 caliber pistol has a "safety" and is a "single action", which means there is no way to discharge the firearm without pulling back on the hammer two clicks.

The Court of Appeal considered all of the evidence presented at trial and found that the State met it's [sic] burden of proving that the defendant did not act in self-defense.  They concluded that the State proved beyond a reasonable doubt that the discharge of defendant's gun was not accidental.

The Court first notes that Mr. Pierce's affidavit regarding Ms. Holifield's recantation of her trial testimony is hearsay, and there is no other evidence to support this claim.  Ms. Holifield's testimony at

- 10 -

trial is supported by the statement she gave to police officers
immediately following the murder.  Further, since there was enough
evidence and testimony of other witnesses presented at trial to
support the verdict, any recantation of Connie Holifield's testimony
would not change the outcome of the trial.  Further, if Connie
Holifield is now recanting her testimony at trial and her initial
statement to the police, her credibility is at best highly suspect.
Accordingly, this claim as to a Brady and Sixth Amendment violation
is denied on the pleadings without the necessity of a hearing.[19]

Without additional reasons assigned, petitioner's related writ applications were then also denied by

the Louisiana First Circuit Court of Appeal[20] and by the Louisiana Supreme Court.[21]

Petitioner thereafter filed another state post-conviction application which this time

included an affidavit from Constance Morris Holifield.  In that affidavit, she stated:

I was at George's bar the night of Harold Cresson's death.  We were
all in the bar when Amy said she was going to the bathroom but
instead she went to the phone to call Harold.  She told me that she
told him she had car trouble and needed him to come to the bar and
help her.  After that she then left with Jerold Craddock and had sex
with him.  Once they came back she and I went to the bathroom and
she was klaughing [sic] because she had come on her pants.  I told
her she was going to get someone killed and she replied "she didn't
care she hoped Jerold beat the shit out of Harold."  Right after we
came out of the bathroom Jerold and Keith Craddock left leaving out
the front door to go home.  Amy soon followed behind them.  I was
sitting at the table when a few minutes later Amy came in and said I
think there'e [sic] going to be trouble outside.  I then got up and went
behind the bar through the kitchen and out the back door, that's when
I heard what sounded like a gunshot.  I ran around the side of the bar
and there was Harold lying on the ground and Jerold asking him if he

---

[19] State Rec., Vol. VI of VII, Reasons for Judgment dated January 7, 2010, pp. 4-6.

[20] State v. Craddock, No. 2010 KW 0425 (La. App. 1st Cir. June 17, 2010); State Rec., Vol. VI
of VII.

[21] State v. Craddock, 58 So.3d 470 (La. 2011) (No. 2010-KP-1672); State Rec., Vol. VI of VII.

was okay.  I did not hear Jerold say "oh yeah motherfucker pow" because I was not there when he shoot him.  I asked what was going on and Jerold told me to go call 911.  I ran around back in the bar and told the bartender to call 911, I then went back out there and Jerold was still by Harold and kept asking him if he was alright.  The next day I met with Chet Bowman and Benny Raynor of Pearl river P.D. Chet told me I needed to tell them that Jerold shot Harold, I told him and Benny I did not see him shoot him I also don't know if there was a pipe or beer bottle.  Chet kept insisting on me saying I seen the shooting, he said I was looking at 40 years and loosing [sic] my kid. He said I would be charged with accessory and perjury.  I the [sic] told them I wasn't going to loose [sic] my kid for nobody because I had done nothing wrong and had nothing to do with it.  At trial I said I saw Harold and Keith fighting and that Jerold went to his truck and pulled out a gun and said something and shoot him.  None of this is true because I was not there at the time Jerold shot Harold only afterwards.  I only made those statements because of the threats made to me by Chet Bowman and Benny Raynor.  I was working at the McNeil truck truck [sic] in Mississippi and everyday of the trial Chet Bowman would come in in his uniform and tell me what was going on in the trial.[22]

Without reasons assigned, petitioner's claim was denied by the state district court,[23] the Louisiana

First Circuit Court of Appeal,[24] and the Louisiana Supreme Court.[25]

Petitioner's claim appears to encompass three legal theories:  a standard claim

concerning the use of perjured testimony; a Brady claim; and a Confrontation Clause claim.

However, relief is not warranted based on any of those theories for the following reasons.

---

[22] Second Supplemental State Rec., Vol. I of I, Affidavit of Constance Morris Holifield dated January 24, 2011.

[23] Second Supplemental State Rec., Vol. I of I.

[24] State v. Craddock, No. 2011 KW 1514 (La. App. 1st Cir. Nov. 9, 2011); Rec. Doc. 25-1, p. 63.

[25] State ex rel. Craddock v. State, 93 So.3d 592 (La. 2012); Rec. Doc. 25-1, p. 96.

As to the standard perjury claim, it is clear that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976) (footnote omitted); see also Napue v. Illinois, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."). However, for a federal court "[t]o grant habeas on false testimony grounds, petitioner must show that (1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false." Beltran v. Cockrell, 294 F.3d 730, 735 (5th Cir. 2002) (citations and quotation marks omitted).

Petitioner has arguably made the showing required on that first prong. As noted, Holifield has now furnished an affidavit in which she states that her testimony at trial was false. Although Holifield's veracity is suspect, the Court will assume for the purposes of this decision that her recantation is credible and that the affidavit is sufficient to satisfy the first prong of the analysis.

Whether that third prong has been met is debatable at best. Here, petitioner has presented no evidence whatsoever that any member of the prosecution team knew that Holifield was committing perjury; rather, his argument is based on the fact that law enforcement officers, i.e. Bowman and Raynor, knew that Holifield was committing perjury. It is unclear whether that third prong is met without evidence that the prosecutors themselves actually knew or believed the testimony was false. See Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990) ("[E]ven if we accept as true Koch's allegations of perjured testimony [by law enforcement officers], Koch does not allege

that the prosecution knew that this testimony was false."); Jordan v. Epps, 740 F. Supp. 2d 802, 824 (S.D. Miss. 2010) ("Knowledge of falsity is not imputed to a prosecutor, even where witness committing the alleged perjury is a member of law enforcement."); but see Boyd v. French, 147 F.3d 319, 329 (4th Cir. 1998) ("[K]nowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution."); United States v. Snoddy, 862 F.2d 1154, 1156 (5th Cir. 1989) ("It is, indeed, true that the police authorities are a part of the prosecution; perjured testimony by the police raises due process concerns whether or not the perjury is known to the prosecuting attorney.").  However, this Court need not resolve that apparent uncertainty in the jurisprudence; instead, the Court can pretermit a finding on that issue because petitioner's claim clearly fails on the second prong.

As noted, the second prong requires a showing of materiality, and perjured testimony is considered material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993) (quoting Agurs, 427 U.S. at 103).  However, the perjured testimony cannot be considered "material" if, in the context of the case a whole, it was ultimately unimportant.  See United States v. O'Keefe, 128 F.3d 885, 894 (5th Cir. 1997).  For example, where the evidence of the petitioner's guilt was overwhelming and the perjured testimony was cumulative, the perjured testimony is not "material." See Carter v. Johnson, 131 F.3d 452, 459 (5th Cir. 1997).

In this case, even if Holifield's allegedly perjured testimony is entirely disregarded, the evidence of petitioner's guilt is still overwhelming.  At trial, Amy Cresson testified that she saw petitioner retrieve his gun from his truck immediately prior to the shooting and, when she asked

what he was going to do, he replied, "I'm going to get the son of a bitch."  Moreover, petitioner admitted that he shot the victim.  Petitioner's defenses, i.e. that he was acting in self defense and that the shooting was accidental, were wholly unsupported by any credible evidence.  Although petitioner and his brother claimed that the victim was the aggressor, all credible evidence was to the contrary.  That evidence showed: Keith Craddock attacked the victim with a bottle; the pool stick which the Craddocks claimed was wielded by the victim was not found at the scene; although Keith Craddock claimed that he was attacked with a PVC pipe wielded by the victim, the marks on the victim's body indicated that the PVC pipe was used to attack him, not *vice versa*; and there was no physical evidence that the victim attacked or injured either of the Craddocks in any way.  Further, the testimony at trial indicated that it was highly unlikely that petitioner's single-action gun fired accidentally.  In light of the overwhelming evidence of petitioner's guilt, it simply cannot be said that there is any reasonable likelihood that Holifield's allegedly perjured testimony could have affected the judgment of the jury.

Petitioner's related claim under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), fails for a similar reason.  <u>Brady</u> held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id</u>. at 87.  <u>Brady</u> claims can arise in several situations.  One such situation, as is relevant here, is where "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976).

- 15 -

However, as noted, a <u>Brady</u> claim also requires a showing of materiality.  With respect to a <u>Brady</u> claim, a different, even more onerous standard of materiality applies than to a charge of knowing use of perjured testimony.  <u>See</u> <u>Kirkpatrick v. Whitley</u>, 992 F.2d 491, 497 (5th Cir. 1993).  Materiality in the context of a <u>Brady</u> claim has been explained as follows:

> Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  In other words, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A reasonable probability exists when the government's suppression of evidence undermines confidence in the outcome of the trial.  To prove a reasonable probability of a different result, the likelihood of a different result must be substantial, not just conceivable.  A "reasonable probability" is less than "more likely than not," but the difference is slight and matters only in the rarest case.

<u>United States v. Brown</u>, 650 F.3d 581, 588 (5th Cir. 2011) (citations, quotation marks and brackets omitted).  As has already been explained, Holifield's testimony was of little consequence in light of other the overwhelming evidence of petitioner's guilt.  Accordingly, even if the prosecution was or should have been aware that her testimony was false and had disclosed evidence of that fact to the defense, there is no reasonable probability that the result of the proceeding would have been different.  Therefore, petitioner's <u>Brady</u> claim has no merit.

Lastly, petitioner asserts a variation of this claim by adding an argument under the federal Confrontation Clause.  The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The Fourteenth Amendment renders the

[Confrontation] Clause binding on the States." Michigan v. Bryant, 131 S. Ct. 1143, 1152 (2011);

see also Pointer v. Texas, 380 U.S. 400 (1965).  Here, petitioner is essentially arguing that he was

deprived of an opportunity to impeach Holifield at trial due to the fact that the state withheld from

the defense the fact that police officers had coerced her to testify.  However, such withholding of

material impeachment evidence is a Brady claim, not a Confrontation Clause claim, and, as already

explained, petitioner's claim fails under a Brady analysis.

### B.  Sequestration Violation

Petitioner's next claim is that his rights were infringed because there was a violation

of the trial court's order that the witnesses be sequestered.

In the first round of post-conviction proceedings, the state district court rejected this

claim on the basis that petitioner's only evidence was the affidavit from Pierce which stated that

Holifield told him in an interview that Officer Chet Bowman came into the store where she was

working during trial and told her what was happening in the trial.  Because Pierce's affidavit was

hearsay and because no affidavit from Holifield was included, the court found that petitioner failed

to meet his burden of proof because his claim was "unsupported by any credible evidence."[26]

Without additional reasons assigned, petitioner's related writ applications were then also denied by

the Louisiana First Circuit Court of Appeal[27] and by the Louisiana Supreme Court.[28]

---

[26] State Rec., Vol. VI of VII, Reasons for Judgment dated January 7, 2010, pp. 2-3.

[27] State v. Craddock, No. 2010 KW 0425 (La. App. 1st Cir. June 17, 2010); State Rec., Vol. VI of VII.

[28] State v. Craddock, 58 So.3d 470 (La. 2011) (No. 2010-KP-1672); State Rec., Vol. VI of VII.

- 17 -

In the second round of state post-conviction proceedings, petitioner attempted to cure that defect by furnishing an affidavit from Holifield herself.  As previously noted, in that affidavit, she stated:  "I was working at the McNeil truck truck [sic] in Mississippi and everyday of the trial Chet Bowman would come in in his uniform and tell me what was going on in the trial."[29]  However, without reasons assigned, petitioner's claim was again denied by the state district court,[30] the Louisiana First Circuit Court of Appeal,[31] and the Louisiana Supreme Court.[32]

In order to be entitled to federal *habeas corpus* relief, petitioner must demonstrate that the state court's ultimate decision[33] to deny his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  He has made no such showing here for the following reasons.

---

[29] Second Supplemental State Rec., Vol. I of I, Affidavit of Constance Morris Holifield dated January 24, 2011.

[30] Second Supplemental State Rec., Vol. I of I.

[31] State v. Craddock, No. 2011 KW 1514 (La. App. 1st Cir. Nov. 9, 2011); Rec. Doc. 25-1, p. 63.

[32] State *ex rel.* Craddock v. State, 93 So.3d 592 (La. 2012); Rec. Doc. 25-1, p. 96.

[33] The fact that the state courts provided no reasons for denial of the claim on the second round of post-conviction review is of no moment, because a federal court's *habeas* review looks only to the state court's ultimate decision, not its reasoning.  See, e.g., Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) ("It seems clear to us that a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision."); Catalan v. Cockrell, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e have held that under the deferential standard of AEDPA, we review only the state court's decision, not its reasoning or written opinion, to determine whether it is contrary to or a misapplication of clearly established federal law.")

There is no federal constitutional right to sequestration of witnesses.  See, e.g., Mathis v. Wainright, 351 F.2d 489 (5th Cir. 1965) ("Appellant's complaint that the trial court failed to invoke the rule of sequestration of witnesses does not raise a question that can be reached by federal habeas corpus, since such denial does not amount to a deprivation of appellant's constitutional rights." (citation omitted)); see also Gustafson v. Burt, Civ. Action No. 01-73692, 2010 WL 3342315, at *5 (E.D. Mich. Aug. 25, 2010) ("While sequestration of witnesses is a long-established and well-recognized measure designed to increase the likelihood that testimony will be candid, it is not required by the Due Process Clause." (quotation marks omitted)).  Therefore, even if a judge's sequestration order is violated, "that violation, per se, raises no federal constitutional issue."  Williams v. Maryland, 375 F. Supp. 745, 752 (D. Md. 1974); see also Logan v. Cain, Civ. Action No. 11-2381, 2013 WL 3293659, at *15 (E.D. La. June 28, 2013) ("[A] violation of an order of sequestration is insufficient to raise a claim cognizable on federal habeas review.")

Petitioner therefore attempts to overcome that obstacle by framing his claim as a violation of the Confrontation Clause.  However, he does not identify a single United States Supreme Court ruling which holds that a witness's violation of sequestration order violates the Confrontation Clause.  Moreover, this Court has found no case from the Supreme Court, or from any federal court for that matter, which clearly supports petitioner's Confrontation Clause claim.  As already noted, where, as here, the jurisprudence of the United States Supreme Court "give[s] no clear answer to the question presented, let alone one in [petitioner's] favor," it simply cannot be said that a state court's ruling impermissibly ran afoul of clearly established federal law for purposes of §

2254(d)(1).  Wright v. Van Patten, 552 U.S. 120, 126 (2008); see also Wilson v. Cain, 641 F.3d 96,

100 (5th Cir. 2011); Richardson v. Quarterman, 537 F.3d 466, 473 (5th Cir. 2008).  Accordingly,

under the deferential standards of the AEDPA, this Confrontation Clause claim should be rejected.

## C.  Denial of a Post-Conviction Evidentiary Hearing

Petitioner next claims that his rights were violated in the state post-conviction

proceedings when the state courts failed to hold an evidentiary hearing to afford him an opportunity

to "cross examine the state's star witness, Connie Morris Holifield as to her recanted testimony."[34]

However, even if the state courts erred by failing to hold such a hearing, federal *habeas corpus* relief

simply cannot be granted to remedy errors which occurred in state *post-conviction* proceedings.  As

the United States Fifth Circuit Court of Appeals has explained:

> [O]ur circuit precedent makes abundantly clear that errors in state
> postconviction proceedings will not, in and of themselves, entitle a
> petitioner to federal habeas relief.  See, e.g., Hallmark v. Johnson,
> 118 F.3d 1073, 1080 (5th Cir. 1997) ("[I]nfirmities in state habeas
> proceedings do not constitute grounds for relief in federal court.");
> Nichols v. Scott, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on
> a state habeas proceeding does not entitle the petitioner to habeas
> relief in respect to his conviction, as it is an attack on a proceeding
> collateral to the detention and not the detention itself.") (internal
> quotations omitted).  Rather, we must find constitutional error *at the*
> *trial or direct review level* in order to issue the writ.

Morris v. Cain, 186 F.3d 581, 585 n.6 (5th Cir. 1999) (emphasis added); see also Duff-Smith v.

Collins, 973 F.2d 1175, 1182 (5th Cir. 1992); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL

3564827, at *23 (E.D. La. Oct. 29, 2009); Baham v. Allen Correctional Center, Civ. Action No. 07-

4075, 2009 WL 3148757, at *3 (E.D. La. Sept. 30, 2009); Davis v. Cain, Civ. Action No. 07-6389,

---

[34] Rec. Doc. 3, p. 28.

2008 WL 5191912, at *6 (E.D. La. Dec. 11, 2008).  Although application of this rule often proves

harsh, the Fifth Circuit has emphatically held that it must nevertheless be followed, stating:

> We, as a federal appeals court entertaining a *federal* habeas corpus
> application, are without jurisdiction to review the constitutionality of
> [the petitioner's] state postconviction proceedings. Indeed, we are
> barred from doing so by our "no state habeas infirmities" rule. ...
> [O]ur hands are tied by the AEDPA, preventing our review of [the
> petitioner's] attack on his Louisiana postconviction proceedings, so
> we dutifully dismiss his claim.

Kinsel v. Cain, 647 F.3d 265, 273-74 (5th Cir. 2011) (footnote omitted).

Accordingly, this claim must also be rejected.

### D.  Ineffective Assistance of Counsel

Petitioner next claims that he received ineffective assistance of counsel.  In the state

post-conviction proceedings, the state district court rejected this claim, holding:

> Defendant asserts that his counsel was ineffective in that he
> failed to call certain witnesses and to investigate the case.
> Specifically, defendant alleges that his counsel should have called
> Wayne O'Berry, Shawn Ryan, and Ronnie Witeritch to testify at trial.
> Defendant claims that these witnesses would have testified that prior
> to the murder, Cresson had made threats against the defendant.  There
> was evidence presented at the trial by various witnesses that the
> victim had made threats against the defendant while speaking to
> others, and that the defendant knew of such threats.  The defendant
> even testified at trial that Cresson came to his home on four occasions
> in the weeks preceding the shooting, and that the victim told others
> that he intended to kill defendant.  Defendant argued that this
> supported his claim that he feared for his life and acted in self-
> defense when he grabbed his gun.
> The Court finds that the testimony of these additional
> witnesses would have added no new material evidence to the trial.
> There was enough substantial evidence to support the conviction.
> The jury chose not to believe the defendant's self-defense theory.
> Further, this matter was thoroughly reviewed by the First Circuit
> Court of Appeal which affirmed the jury's verdict based on the record

> presented.  There has been no showing made by the defendant that his counsel was ineffective under either prong of <u>Strickland v. Washington</u>, 446 U.S. 668, 104 S. Ct. 2052, 80 L.Ed 2d 674 (1984).  In fact, defendant's counsel presented a well-prepared defense in the matter.  These claims are denied without the necessity of a hearing.[35]

Without additional reasons assigned, petitioner's related writ applications were then also denied by the Louisiana First Circuit Court of Appeal[36] and by the Louisiana Supreme Court.[37]

Because such a claim is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court has explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable.  This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

---

[35] State Rec., Vol. VI of VII, Reasons for Judgment dated January 7, 2010, p. 3.

[36] <u>State v. Craddock</u>, No. 2010 KW 0425 (La. App. 1st Cir. June 17, 2010); State Rec., Vol. VI of VII.

[37] <u>State v. Craddock</u>, 58 So.3d 470 (La. 2011) (No. 2010-KP-1672); State Rec., Vol. VI of VII.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S. Ct. 770, 785-86 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether*

- 23 -

> there is any reasonable argument that counsel satisfied _Strickland_'s
> deferential standard.

Id. at 788 (citations omitted; emphasis added).  For the following reasons, the Court finds that, under these stringently deferential standards, it simply cannot be said that relief is warranted in the instant case with respect to petitioner's ineffective assistance of counsel claim.

As correctly noted by the state district court, ineffective assistance of counsel claims must be analyzed under the two-prong test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  Specifically, a petitioner seeking relief must demonstrate that counsel's performance was deficient _and_ that the deficient performance prejudiced his defense.  Id. at 697.  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed

as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

In this case, petitioner claims that counsel was ineffective because he failed to adequately investigate the case to discover additional witnesses who could have been called for the defense.  Although he does not identify the proposed witnesses when discussing this claim in his federal application, he identified them in his state application as Wayne O'Berry, Shawn Ryan, and Ronnie Witerich.

A petitioner asserting a claim for inadequate investigation bears the burden to provide factual support as to what further investigation would have revealed.  See Moawad v. Johnson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008). Petitioner has attempted to meet his burden of proof by submitting the following documents:

1.      **An affidavit executed by Wayne O'Berry.**  In that affidavit, O'Berry stated that he saw the victim the weekend before his death.  On that occasion, the victim stated that "he was going to get Jerald Craddock for 'taking my old lady off.'"  O'Berry stated that he subsequently informed petitioner of the victim's threat.  O'Berry further stated that "[e]veryone knew Harold Cresson was strung out on drugs," "was the type of fellow that would 'lose his head quick,'" used pipes from his truck to fight people, and made no secret of the fact that he "was out to get Jerald Craddock."

2.      **A transcript of a telephone interview of Shawn Ryan conducted by Jack Pierce.**  In that interview, Ryan stated that he had not personally heard the victim threaten petitioner but was aware that the victim had made such threats to Joey Ryan (Shawn Ryan's half-brother) on three or four occasions.

3.      **A transcript of a telephone interview of Ronnie Witerich conducted by Jack Pierce.**  In that interview, Witerich stated that he, petitioner, and others were working on a roof and someone said that the victim was going to come and "whip" petitioner.  Shortly thereafter, Witerich saw the victim drive up in a truck; however, the victim then "backed out and he

- 26 -

peeled out and left."  The victim was killed approximately one month later.

As an initial matter, the Court notes there is no evidence whatsoever that counsel did not in fact interview O'Berry, Ryan, and Witerich.  However, even if the Court assumes for the purposes of this decision that counsel did not interview these witnesses, petitioner's claim still fails on both prongs of the <u>Strickland</u> test.

As to the deficiency prong, petitioner must show that counsel would have had some reason to interview these individuals, and that showing simply has not been made.  These individuals were not present at the murder and had no information as to what actually occurred that fateful night.  While petitioner is obviously suggesting that they should have been interviewed because they could have supported his theory of self-defense, petitioner does not indicate that he or anyone else informed counsel that these individuals had such information.  If counsel had no reason to be aware of a potential witness's existence, he cannot be considered to have performed deficiently for failing to interview the witness.  <u>See, e.g.</u>, <u>Ramirez v. Dretke</u>, 398 F.3d 691, 698 (5th Cir. 2005); <u>Drew v. Collins</u>, 964 F.2d 411, 422-23 (5th Cir. 1992).

Second, in any event, petitioner's claim also clearly fails on the prejudice prong of the <u>Strickland</u> test.  Shawn Ryan's information that Joey Ryan had said the victim threatened petitioner was hearsay; moreover, in any event, Joey Ryan testified at trial concerning those threats.  Witerich's information was of little if any relevance, in that nothing of moment actually occurred during the incident he witnessed.  Only O'Berry's information was of any value; however, as the state judge noted, it was established by other witnesses at trial that petitioner was aware of the victim's alleged threats.  Therefore, even if Berry had been called to testify, his testimony would

- 27 -

have been merely cumulative.  Counsel's failure to discover and present cumulative testimony is not prejudicial because there is no reasonable probability that a different result would have been obtained even if the testimony had been presented.  See, e.g., Stoker v. Scott, No. 94-11089, 1996 WL 661639, at *10 n.10 (5th Cir. Oct. 25, 1996); Lewis v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *11 (E.D. La. Oct. 16, 2009), aff'd, 444 Fed. App'x 835 (5th Cir. 2011); Ketchum v. Quarterman, Civ. Action No. C-08-193, 2008 WL 4552795 (S.D. Tex. Oct. 7, 2008).

In light of the foregoing, the undersigned finds that petitioner has failed to show that the state court's decision rejecting his ineffective assistance claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, under the doubly deferential standards of review mandated by the AEDPA, this claim should be denied.

### E.  Cumulative Error

Lastly, petitioner argues that the cumulation of errors committed during the state court proceedings rendered his trial fundamentally unfair.  In the state post-conviction proceedings, the state district court rejected this claim, holding:

> Defendant asserts ... that even if none of his claims alone would justify a new trial, the cumulative effect of the errors does justify a new trial.  As noted above, the Court has found that none of these claims have any merit, therefore this claim is dismissed on the showing made.[38]

The state court's decision clearly does not run afoul of federal law so as to warrant relief in this proceeding.  The United States Fifth Circuit Court of Appeals has long expressed its

---

[38] State Rec., Vol. VI of VII, Reasons for Judgment dated January 7, 2010, p. 6.

disfavor of such claims in federal *habeas corpus* proceedings.  For example, the Fifth Circuit has noted:

> [Petitioner] finally asserts that even if none of his claims entitles him to relief individually, all of them collectively, do.  Habeas relief is available only where a prisoner is in custody in violation of the Constitution or of federal law.  28 U.S.C. § 2254.  [Petitioner] cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit.  We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it.  Twenty times zero equals zero.

Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987).

Nevertheless, the Fifth Circuit subsequently recognized such claims, albeit in a strictly narrow set of circumstances.  The Fifth Circuit noted:

> In Derden v. McNeel, 978 F.2d 1453, 1454 (5th Cir. 1992), cert. denied, 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993), the en banc court recognized an independent claim based on cumulative error only where "(1) the individual errors involved matters of constitutional dimensions rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'"  Id., quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).  *Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised.*  Derden, 978 F.2d at 1461.

Westley v. Johnson, 83 F.3d 714, 726 (5th Cir. 1996) (emphasis added); see also Jackson v. Johnson, 194 F.3d 641, 655 (5th Cir. 1999) ("The cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness.").

In the instant case, petitioner has not shown that any of his individual claims have merit and, therefore, he is not entitled to relief merely by cumulating those claims, especially when he has not established that the cumulative effect of the alleged errors rendered his trial fundamentally unfair.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition of **Winston Jerald Craddock** for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[39]

New Orleans, Louisiana, this twenty-third day of June, 2014.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

---

[39] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.